**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION**

**SHERI L. TILLEY**                                                                                         **PLAINTIFF**

      **VS.**                          **Civil No. 2:17-cv-02149-MEF**

**NANCY A. BERRYHILL, Commissioner,
Social Security Administration**                                                                 **DEFENDANT**

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, Sheri L. Tilley, brings this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of a decision of the Commissioner of Social Security Administration (the "Commissioner") denying her claim for a period of disability, disability insurance benefits ("DIB") and supplemental security income ("SSI") under the provisions of Titles II and XVI of the Social Security Act (the "Act"). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. *See* 42 U.S.C. § 405 (g).

### I.       Procedural Background

Plaintiff filed her applications for SSI and DIB on June 28, 2013, due to bipolar, seizures, stress tension migraines, high blood pressure, ulcers, low back pain, and neck pain. (ECF No. 10, pp. 159, 962). Plaintiff alleged an onset date of April 30, 2008. (ECF No. 10, pp. 159, 962). Plaintiff had previously drawn benefits from April 30, 2008 through June 30, 2013. (ECF No. 10, p. 159). Her claims were denied initially on February 12, 2014, and upon reconsideration on May 7, 2014. (ECF No. 10, pp. 159, 759-762, 770-772). An administrative hearing was scheduled for January 13, 2015, and Plaintiff's representative was present, but Plaintiff did not appear, so the hearing was postponed. (ECF No. 10, p. 159). A second

hearing was scheduled for January 5, 2016, at which Plaintiff appeared, but her representative had withdrawn, so she was granted a continuance to find new representation. (*Id.*). An administrative hearing was eventually held on May 19, 2016, in Fort Smith, Arkansas, before the Hon. Edward M. Starr, Administrative Law Judge ("ALJ"). (ECF No. 10, pp. 159, 182-218). Plaintiff appeared in person and was represented by counsel, Laura J. McKinnon. (*Id.*). Vocational expert, Montie U. Lumpkin, and Plaintiff's mother, Toni Lee Pullen, also testified at the hearing. (*Id.*).

By written decision dated June 28, 2016, the ALJ found Plaintiff's affective disorder, anxiety, degenerative disc disease, and seizure disorder of the ankle to be severe, but that Plaintiff's impairments did not meet or equal the level of severity of any impairment listed in the Listing of Impairments. (ECF No. 10, pp. 161-162). The ALJ found that Plaintiff retained the residual functional capacity ("RFC") to:

> perform light work, but she is limited to occasional climbing, balancing, crawling, kneeling, stooping, and crouching; no operation of a motor vehicle; and no exposure to hazards including unprotected heights and moving machinery. The claimant can perform simple, routine, repetitive tasks in a setting where interpersonal contact is incidental to the work performed; and she can respond to supervision that is simple, direct, and concrete.
> (ECF No. 10, pp. 163-172).

With the assistance of a vocational expert ("VE"), the ALJ then determined Plaintiff would be unable to perform any past relevant work (ECF No. 10, p. 172); however, the ALJ found Plaintiff could perform the requirements of the representative occupations of: Labeler/Stamper/Marker II (DOT No. 920.687-126), 24,738 jobs in the national economy; Motel Maid (DOT No. 323.687-014), with 136,281 jobs in the national economy; or, Shipping and Receiving Weigher (DOT No. 222.387-074), with 1,776 jobs in the national economy. (ECF No. 10, p. 173). The ALJ found Plaintiff had not been disabled under the definition of the Act from July 1, 2013, through the date of his decision. (*Id.*).

On June 26, 2017, the Appeals Council denied Plaintiff's request for review. (ECF No. 10, pp. 1-5). Plaintiff then filed this action. (ECF No. 1). This matter is before the undersigned for report and recommendation. Both parties have filed appeal briefs. (ECF Nos. 13, 14). The case is ready for decision.

## II.    Relevant Evidence

The undersigned has conducted a thorough review of the entire record in this case. The complete sets of facts and arguments are presented in the parties' briefs and are repeated here only to the extent necessary.

At the administrative hearing held on May 19, 2016, Attorney McKinnon asked for the record to be held open to obtain current psychiatric records. The ALJ granted her a 30-day extension. (ECF No. 10, p. 184). Plaintiff testified she had seizures two to three times per month, and that they were not well controlled even though she took medications prescribed for them. (ECF No. 10, p. 200). Plaintiff testified that Dr. Belinga had been treating her seizures and referred her for psychiatric treatment with Dr. Fiori in hopes that controlling her anxiety and bipolar would reduce her stress and help her seizure medication work better. (*Id*.). Plaintiff testified that when she had a grand mal seizure it would last three to six minutes, and if they lasted over five minutes she had been told to go the hospital because she had a mini-stroke and a full-blown stroke before. (ECF No. 10, p. 201). Plaintiff testified that she had been "fired" by a couple of doctors for not showing up. (ECF No. 10, p. 203). Plaintiff testified that she lived in a camper in her mother's yard, and that she would be unable to live anywhere alone because she just could not remember things, including things like coming to the hearing today. (ECF No. 10, pp. 204-205).

On January 14, 2014, Plaintiff was seen by Dr. Jon M. Gustafson at Sparks Neurology Center requesting a referral to Dr. Lu in Fayetteville, Arkansas for pain management. (ECF No.

10-1, pp. 353-354). Dr. Gustafson noted Plaintiff was last seen in December of 2011, and at that time she was on Lamictal 100 mg BID and Dilantin 100 mg BID but had been advised to discontinue. (*Id*.). Dr. Gustafson noted in the interim between Plaintiff's last appointment in 2011 and this appointment her Dilantin was successfully discontinued, and Plaintiff had done well while on Lamictal. (*Id*.).

On January 28, 2014, Plaintiff was seen by Terry L. Efird, PH.D., for a Mental Diagnostic Evaluation. (ECF No. 10-1, p. 338-341). Dr. Efird's notes show Plaintiff reported having applied for disability benefits due to epilepsy, seizures, and a stroke that occurred about four years ago. (*Id*.). Plaintiff also reported feeling scared and anxious most of the time; having problems sleeping, resulting in getting an average of six hours of sleep per night; increased appetite with decreased energy; difficulty concentrating and making decisions; and, mood swings occurring every other day. (*Id*.). Plaintiff reported last being seen by a mental health professional years ago, and she was currently prescribed Amitriptyline and Lamictal by a neurologist and was taking them with no remarkable benefits or side effects. (ECF No. 10-1, p. 339). Plaintiff was living with her "common law husband" and two children in a camper in her parent's backyard. (*Id*.). Plaintiff was able to perform basic self-care tasks independently, and her ability to perform household chores was only impeded by physical pain. (*Id*.). Dr. Efird described Plaintiff's mood and affect as anxious, with somewhat halting speech, and her intellectual functioning as probably low average to possibly low average. (ECF No. 10-1, p. 339-340). Dr. Efird provided a diagnosis of moderate major depressive disorder and generalized anxiety disorder. (ECF No. 10-1, p. 340). Considering the effects of Plaintiff's mental impairments on adaptive functioning, Dr. Efird found: that Plaintiff communicated and interacted in a reasonably socially adequate, but anxious manner; she communicated most basic information in a reasonably intelligent and effective manner; she had the capacity to perform basic cognitive

tasks required for basic work like activities; she struggled markedly on the tasks of digit span and serial threes; she had no notable problems with persistence during the evaluation, but sustained persistence over longer time frames was reasonably probable; and, her mental pace of performance was probably mildly to moderately low. (ECF No. 10-1, p. 341).

On February 20, 2014, Plaintiff saw Dr. Kelli Rippy and reported doing well on Lamictal for her seizures, but she was still suffering from a lot of back pain. (ECF No. 10-1, p. 344). Plaintiff reported that she quit going to pain management when she lost her insurance and was requesting referral to another pain management physician. (*Id.*). She also reported anxiety attacks and breaking out in hives as well as mood swings. (*Id.*). Dr. Rippy assessed Plaintiff as suffering from fatigue, menopause, lumbago, and anxiety. (*Id.*). Dr. Rippy noted that she had no records from Plaintiff's neurologist or previous pain management physician, no MRI or x-ray reports, and that Plaintiff had been prescribed narcotics on many occasions. (ECF No. 10-1, p. 345). Dr. Rippy planned to treat Plaintiff with non-narcotic alternatives and refer her to a pain management physician. (*Id.*).

On June 9, 2014, Plaintiff was seen by Dr. Regina Thurman for neck and lower back pain. (ECF No. 10, p. 225). Dr. Thurman's notes show Plaintiff reported her lower back pain started after she had her child, and she had been experiencing chronic pain for 15 years. (*Id.*). Plaintiff reported pain in her low back and between her shoulder blades, and she had been treated with bed rest, a nerve block, and injections but experienced no improvement, although a TENS unit and heat helped. (*Id.*). Plaintiff reported the pain averaged around 4/10 and had reached a maximum of 8/10. (*Id.*). Plaintiff described the pain as radiating from the neck to the back and having an aching, sharp, shooting, and tingling quality with tingling in the extremities. (*Id.*). Dr. Thurman performed a physical examination and found Plaintiff's paraspinal musculature was tender to palpation in the cervical and lumbosacral regions, but the range of motion in both

regions was normal.  (ECF No. 10, p. 226).  She found Plaintiff's legs and arms had no tenderness to palpation or pain on motion, with normal range of motion and normal muscle tone and bulk.  (*Id*.).  Dr. Thurman also performed a mental examination and found that Plaintiff's speech, orientation, and attention were normal.  (*Id*.).

On July 8, 2014, Plaintiff saw Dr. Thurman for a follow up visit and reported she was doing well and that her medications were working well for her neck and back pain.  (ECF No. 10, p. 232).  Plaintiff reported that her pain was a 6/10 with medication, and a 9/10 without medication.  (*Id*.).  Plaintiff reported nausea at times with the medication, but no new significant side effects or excessive drowsiness from medication.  (*Id*.).  Dr. Thurman performed a physical examination which revealed no abnormal findings beyond continued tenderness in Plaintiff's cervical and lumbar spine with decreased range of motion in the lumbar region.  (ECF No. 10, p. 233-234).

On July 25, 2014, Plaintiff saw Dr. Rippy for anxiety and migraines.  (ECF No. 10-1, p. 381).  Plaintiff reported she was nervous about the possibility of having spinal surgery, and she was under a lot of stress due to having guardianship of her young grandson.  (*Id*.).  She reported seeing Dr. Thurman for pain management and that her pain was in better control.  (*Id*.).  Plaintiff also reported she was still having frequent headaches, possibly due to only sleeping three to four hours a night due to feeling shaky and anxious.  (*Id*.).

On April 9, 2014, Plaintiff saw Dr. Gustafson at Sparks Neurology Center and reported she was still having seizures about twice per week and frequent headaches.  (ECF No. 10-1, p. 352).  Dr. Gustafson noted Plaintiff was last seen in January 2014, and before that her last visit had been slightly more than two years prior.  (*Id*.).  Plaintiff reported her referral to Dr. Lu for pain management was still pending, and Dr. Gustafson prescribed hydrocodone for 30 days with no refills.  (ECF No. 10-1, pp. 352-353).  Dr. Gustafson added that no refills would be

considered until pain management referral was verified, and even with that information he may or may not agree to prescribe any further hydrocodone.   (*Id*.).

On September 2, 2014, Plaintiff saw Dr. Thurman again and reported she had been to a surgical consultation, but they had diagnosed her with fibromyalgia and did not want to do anything due to the extent of her disease.   (ECF No. 10, p. 232).   Plaintiff described her pain as 7/10 with medication and a 10/10 without medication.   (*Id*.).   Dr. Thurman noted Plaintiff was not pleased with her medications, but she reported no significant new side effects or excessive drowsiness.   (*Id*.).   A physical examination found no abnormalities beyond paraspinal musculature tenderness in Plaintiff's cervical and lumbar regions.   (ECF No. 10, p. 233-234).

On October 28, 2014, Plaintiff returned to Dr. Thurman and reported she did not like oxycodone as she felt it made her feel irritable, and she preferred the Percocet although she had to take a few more.   (ECF No. 10, p. 236).   Plaintiff reported having an epidural, but it was very painful, and she had no relief afterwards.   (*Id*.).   Plaintiff rated her pain as 6/10 with medication and an 8/10 without medication.   (*Id*.).   Physical examination revealed no abnormalities beyond paraspinal musculature tenderness in Plaintiff's cervical and lumbar regions.   (ECF No. 10, p. 237-238).

On December 22, 2014, Dr. Thurman reported Plaintiff was doing okay with her medications, but she was still having some joint pain which was aggravated by weather changes.   (ECF No. 10, p. 240).   Plaintiff was pleased with her current medications, and there were no new or significant side effects or drowsiness from medications.   (*Id*.).   Plaintiff described her pain as a 6/10 with medication and a 9/10 without medication.   (*Id*.).   Physical examination showed no abnormalities beyond paraspinal musculature tenderness in Plaintiff's cervical and lumbar regions.   (ECF No. 10, p. 241-242).

On December 30, 2014, Plaintiff saw Dr. John Urban requesting a referral to a surgeon for gallbladder surgery. (ECF No. 10-1, p. 415). Plaintiff reported being told to have her gallbladder removed six years ago, but she had an infection and they wouldn't remove it then. She never went back, but it started bothering her again. (*Id*.).

On January 6, 2015, Dr. Thurman sent Plaintiff a letter notifying her that she would no longer be seen for pain management due to a breach in Plaintiff's narcotic contract – specifically her positive urine drug screen for methamphetamine. (ECF No. 10, p. 243).

On August 17, 2015, Plaintiff saw Dr. Rippy for a hospital follow up. (ECF No. 10-1, p. 413). Dr. Rippy noted Plaintiff was first seen at Mercy ER in Ozark, but she was transferred to Mercy Fort Smith for further care where she was kept for three days. (*Id*.). Dr. Rippy wrote that Plaintiff was having "kidney pain" prior to her admission, and she admitted taking some pain medication from an outside source. (ECF No. 10, p. 413) (quotation in original). A CT scan did not show kidney stones, and her kidney ultrasound was normal; however, on the day of admission Plaintiff had four syncopal events and was found to have a creatinine of 4.4 and potassium levels of 2.9. (*Id*.). Dr. Rippy noted Plaintiff's syncope was felt to be due to hypotension from dehydration and illicit drug use, however, she could not see a UDS in Plaintiff's hospital records. (*Id*.).

On September 28, 2015, Plaintiff saw Dr. Belinga to establish care for her seizures and anxiety. (ECF No. 10-1, p. 383). Dr. Belinga noted Plaintiff had grand and petit mal seizures, as well as a history of severe anxiety. (*Id*.). He noted her seizures happened four times monthly, lasting between 30 seconds and three minutes with tongue biting, lip biting, and rolling back of the eyes. (*Id*.). Dr. Belinga performed a physical examination with normal findings, except that Plaintiff was very shaky and attributed that to bad anxiety. (ECF No. 10-1, p.

384-385).  Dr. Belinga ordered an EEG and MRI brain work up, and she prescribed Keppra 500 mg BID.  (ECF No. 10-1, p. 391).

On October 14, 2015, Plaintiff had an MRI without contrast of her brain.  (ECF No. 10-1, p. 396).  The results were interpreted by Dr. Martin Cain, who found that no acute intracranial abnormality was evident, but that chronic bilateral maxillary sinus inflammatory disease was present.  (*Id.*).

On December 21, 2015, Plaintiff returned to Dr. Belinga for a follow up appointment. (ECF No. 10-1, p. 393).  Dr. Belinga noted Plaintiff's seizures were more frequent with three grand mal seizures and a handful of petit mal seizures.  (*Id.*).  He noted that Plaintiff could tell when they are coming on, and she had stress tension migraines which usually brought about her seizures.  (*Id.*).  His notes show Plaintiff described tongue biting, urinary incontinence, and stuttering.  (*Id.*).  A physical examination was normal, except numbness and pain in Plaintiff's right upper extremity stemming from the elbow with a subjective feeling of swelling in the right hand, and Plaintiff's gait was a bit hesitant.  (ECF No-1. 10, p. 394).  Dr. Belinga increased Keppra for the increased frequency of seizures, citing prior reactions to other medication.  (*Id.*).

On January 1, 2016, Plaintiff had gall bladder imaging which was reviewed by Dr. Jeffrey Hale.  (ECF No. 10-1, p. 424).  Dr. Hale found the gallbladder was clear with normal wall thickness with no abnormality seen.  (*Id.*).

On February 9, 2016, Plaintiff saw Dr. Javed Rana at the Cornerstone Medical group with complaints of lower back pain.  (ECF No. 10-1, p. 434).  Dr. Rana noted Plaintiff had a history of degenerative disc disease and had been advised by a neurologist to find a primary care physician and have an MRI done due to her history of epilepsy and a concern that the disks were moving more into her spinal cord.  (*Id.*).  Dr. Rana advised Plaintiff that he would not be able to provide her with the proper treatment.  (ECF No. 10-1, p. 435).

On February 16, 2016, Plaintiff saw Dr. Rachel Fiori at Mercy Clinic Behavioral Health upon referral by Dr. Belinga who felt that better control of her psychiatric conditions would reduce the frequency of seizures.   (ECF No. 10-1, p. 398).   Dr. Fiori noted that Plaintiff reported having anxiety her whole life, which worsened when she was 10 and her father died. (*Id*.).   Plaintiff reported episodes of panic in which she shut down and isolated herself.   These episodes lasted 15 minutes to an hour and were brought on a few times per month when she was pushed out of her comfort zone.   (*Id*.).   Plaintiff reported symptoms of difficulty breathing, welts, shakes, itching, and sweaty palms.   (*Id*.).   Plaintiff also reported a history of molestation and rape and a diagnosis of PTSD.   (*Id*.).   Plaintiff reported suffering from flashback nightmares, distrust of others, and a fear that bad things would happen to her daughters.   (*Id*.). Plaintiff reported episodes of mania with a few weeks where she would not need sleep, her mind would race, she would talk fast and experience intense/quick anger.   (*Id*.).   Dr. Fiori diagnosed Plaintiff with chronic post-traumatic stress disorder and bipolar effective disorder, currently depressed.   (ECF No. 10-1, p. 402).

On March 15, 2016, Plaintiff saw Dr. Rana for seizures, shoulder pain, and lower back pain.   (ECF No. 10-1, p. 432).   Treatment notes show Plaintiff woke up with a seizure at 3:30 a.m., and she had a second seizure at noon where she fell to the floor and hurt her shoulder and back.   (*Id*.).

On March 21, 2016, Plaintiff saw Dr. Fiori for a one month follow up visit.   She reported her mood had not been very good, and she did not feel well on her lithium, stating that her anxiety was through the roof.   (ECF No. 10-1, p. 404).   Dr. Fiori's treatment plan included discontinuing lithium and doing a trial of Seroquel, as well as increasing Plaintiff's dose of clonazepam due to Plaintiff's level of distress.   (ECF No. 10-1, p. 405).

On April 1, 2016, Plaintiff returned to Dr. Rana for pyonephrosis, fever, calculus of the kidney, lower back pain, and thoracic spine pain.   (ECF No. 10-1, p. 427).   Dr. Rana opined that Plaintiff was septic and sent her to the Emergency Department.   (ECF No. 10-1, p. 428).

On April 20, 2016, Plaintiff reported to Dr. Firori that while she was sleeping better her mood was the same and her anxiety wasn't any better.   (ECF No. 10-1, 407).   Plaintiff further reported that her migraines had returned, and she had experienced blisters on her tongue since starting Seroquel about three weeks prior.   (*Id*.).   Dr. Fiori discontinued Seroquel and began a trial of Latuda.   (ECF No. 10-1, p. 408).

On May 19, 2016, Plaintiff saw Dr. Fiori for a routine appointment to address her bipolar depression, and she reported her symptoms were under poor control.   (ECF No. 10-1, p. 436). Plaintiff reported facing a lot of issues, including having her disability hearing, being in a great deal of pain and unable to find a primary care or pain management doctor, having migraines, and a doctor's appointment which was rescheduled but reported in her records as a no show.   (*Id*.).

## I.    Applicable Law

This Court's role is to determine whether substantial evidence supports the Commissioner's findings.   *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010).   Substantial evidence is less than a preponderance, but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision.   *Teague v. Astru*e, 638 F.3d 611, 614 (8th Cir. 2011).   We must affirm the ALJ's decision if the record contains substantial evidence to support it.   *Blackburn v. Colvin*, 761 F.3d 853, 858 (8th Cir. 2014).   If there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently.   *Miller v. Colvin*, 784 F.3d 472,

477 (8th Cir. 2015). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, we must affirm the ALJ's decision. *Id.*

A claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); see also 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D). A Plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Only if she reaches the final stage does the fact finder consider the Plaintiff's age, education, and work experience in light of her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982), *abrogated on other grounds by Higgins v. Apfel*, 222 F.3d 504, 505 (8th Cir. 2000); 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

## II.   Discussion

Plaintiff raises the following issues in this matter: (1) whether the ALJ erred in developing the evidence; (2) whether the ALJ erred in not using the medical improvement standard; (3) whether the ALJ erred in his assessment of the severity of Plaintiff's impairments; (4) whether the ALJ erred in evaluating Plaintiff's subjective complaints; and, (5) whether the ALJ erred in the RFC determination.   (ECF No. 13, pp. 6-15).

### A.   Development of the Record

Plaintiff argues the ALJ failed to properly develop the record as he did not order a neuropsychological evaluation.   (ECF No. 13, p. 7).   Plaintiff contends Dr. Efird's mental evaluation was not sufficient evidence to base an RFC upon, particularly as Dr. Efird found some mental limitations, particularly with pace and persistence.   (*Id*.).   Plaintiff alleges the ALJ erred in not developing treating source opinion from Plaintiff's treating psychiatrist, or in developing limitations secondary to Plaintiff's medication.   (ECF No. 13, pp. 7-8).   Finally, Plaintiff argues the ALJ failed to adequately develop the record by not developing treating or examining source opinion evidence on both mental and physical limitations.   (ECF No. 13, p. 8).

The ALJ owes a duty to a claimant to develop the record fully and fairly to ensure his decision is an informed one based on sufficient facts.   *See Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).   The ALJ is not, however, required to function as the claimant's substitute counsel, but only to develop a reasonably complete record.   *Whitman v. Colvin*, 762 F.3d 701, 707 (8th Cir. 2014) (quoting *Clark v. Shalala*, 28 F.3d 828, 830-31 (8th Cir. 1994)).   While "[a]n ALJ should recontact a treating or consulting physician if a critical issue is undeveloped," "the ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is

disabled." *Johnson v. Astrue*, 627 F.3d 316, 320 (8th Cir. 2010) (quotation, alteration, and citation omitted).

The need for medical evidence does not necessarily require the Commissioner to produce additional evidence not already within the record. An ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision. *Howard v. Massanari*, 255 F.3d 577, 581 (8th Cir. 2001). Providing specific medical evidence to support his disability claim is, of course, the Plaintiff's responsibility, and that burden of proof remains on him at all times to prove up his disability and present the strongest case possible. *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991); 20 C.F.R. §§ 404.1512(a), 416.912(a).

There is no requirement that an ALJ must obtain an RFC assessment from each treating or examining physician. The Eighth Circuit Court of Appeals has upheld the Commissioner's RFC assessment in cases where the ALJ did not rely on a treating physician's functional assessment of the claimant's abilities and limitations. *See e.g., Page v. Astrue,* 484 F.3d 1040, 1043 (8th Cir. 2007) (the medical evidence, state agency physician opinions, and claimant's own testimony were sufficient to determine RFC); *Stormo v. Barnhart*, 377 F.3d at 807-08 (medical evidence, state agency physicians' assessments, and claimant's reported activities of daily living supported the RFC); and, *Masterson v. Barnhart,* 363 F.3d 731, 738 (8th Cir. 2004) (ALJ properly relied upon assessments of consultative physicians and a medical expert).

The ALJ was not required to order a neuropsychological evaluation unless there was inadequate evidence in the record. The ALJ considered Dr. Efird's findings and gave great weight to Dr. Efird's assessment. (ECF No. 10, p. 169). The ALJ also considered the limitations offered by non-examining physicians, Dr. Simon and Dr. Mourot, who both opined that Plaintiff had limitations with sustained concentration and persistence and performing at a

consistent pace, and so would be limited to work involving simple, repetitive, and routine tasks. (ECF No. 10, pp. 172, 687-688, 753, 756).

While Plaintiff argues that the ALJ failed to develop side effects from Plaintiff's pain or psychiatric medications, the record shows Plaintiff reported not experiencing any significant side effects on several occasions to her treating physicians and to Dr. Efird. (ECF No 10, pp. 232, 236, 240, 246; ECF No. 10-1, p. 339).

Plaintiff's assertion that the ALJ committed reversible error by not soliciting opinion evidence from treating physicians is erroneous. An ALJ is not required to procure an RFC assessment from treating or examining physicians, and the ALJ based his RFC assessment upon the opinions of examining and non-examining physicians, the medical evidence of record, and the Plaintiff's own reports. (ECF No. 10, p. 172).

Considering the evidence as a whole, the Court concludes the ALJ was not required to further develop the record because it was already reasonably complete and contained sufficient evidence from which the ALJ could make an informed decision. There is no ambiguity in the medical evidence of record that must be resolved. The lack of RFC assessments from treating physicians does not render the record underdeveloped.

## B. Medical Improvement Standard

In her pre-hearing memorandum, and at the administrative hearing held on May 19, 2016, Attorney McKinnon argued that as Plaintiff received a cessation notice on April 3, 2013 and filed her new application on June 28, 2013, the application should have been considered an appeal and the proper standard would be that of medical improvement. (ECF No. 10, p. 187-188). In the Plaintiff's disability report, received by K. Cottier via Teleclaim, K. Cottier noted, "she said she was confident that once all the right information was gathered, she knew she would be reinstated. She says that her mental issues are bad but doesn't have funds for treatment." (ECF No. 10, p.

959).   There is no further notation indicating whether K. Cottier inquired as to whether Plaintiff wished to submit an appeal or a new application.

The regulations provide that when a claimant is dissatisfied with the initial determination regarding her entitlement to benefits (her cessation of benefits), the claimant must make a written request for reconsideration within 60 days after being notified of the original determination.   *See* 20 C.F.R. §§ 404.909, 416.1409; *see also* Program Operations Manual System (POMS) GN 03102.100(C)(6) (The Reconsideration Process).   The agency "presumes the date the individual receives the notice is 5 days after the date on the notice, unless the individual can show us that he or she did not receive the notice within the 5 days."   POMS GN 03102.100(C)(6).

Plaintiff's request for reconsideration was due on June 7, 2013 (65 days after April 3, 2013).   However, as Plaintiff admits, her application was submitted on June 28, 2013. Therefore, regardless of whether Plaintiff's new application could be considered a request for reconsideration, no request for reconsideration was received timely.   Plaintiff's argument on this point is without merit.

## C.   Severity of Impairments

Plaintiff next argues that the ALJ did not consider her multiple impairments and erred by failing to consider her somatoform disorder.   (ECF No. 13, pp. 16-17).

At Step Two, a claimant has the burden of providing evidence of functional limitations in support of their contention of disability.   *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities."   *Id.* (citing *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987); 20 C.F.R. § 404.1521(a)).   "If the impairment would have no more than a minimal effect on the claimant's ability to work, then it

does not satisfy the requirement of step two." *Id.* (citing *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007)).

Here, the ALJ did consider the Plaintiff's prior diagnosis of somatoform disorder and noted that she was found to have experienced medical improvement and disability ceased in April 2013. (ECF No. 10, p. 165). Plaintiff was diagnosed with somatoform disorder by Kathleen M. Kralik, Ph.D. in July 2009 during a mental evaluation ordered in the course of a previous application for disability benefits. (ECF No. 10, p. 166). The ALJ gave some weight to Dr. Kralik's assessment but found that subsequent records indicated Plaintiff's symptoms improved. (*Id.*). The ALJ also specifically considered the severity of claimant's physical and mental impairments singly and in combination and performed a paragraph B analysis. (ECF No. 10, p. 162).

Substantial evidence supported the ALJ's Step Two findings.

### D.  Subjective Complaints

Plaintiff argues that the ALJ erred in failing to make a credibility determination, and that the ALJ never provided any conflicts or inconsistencies in support of his rejection of credibility. (ECF No. 13, p. 13).

The ALJ is required to consider all the evidence relating to Plaintiff's subjective complaints, including: (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of her pain; (3) precipitation and aggravating factors; (4) dosage, effectiveness, and side effects of her medication; and, (5) function restrictions. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). In so doing, the ALJ must also consider the claimant's prior work record, observations made by third parties, and the opinions of treating and examining physicians. *Id.*, 739 F.2d at 1322.

An ALJ may not discount the Plaintiff's subjective complaints solely because the medical evidence fails to support them.  (*Id*.).  However, "[a]n ALJ . . . may disbelieve subjective reports because of inherent inconsistencies or other circumstances."  *Wright v. Colvin*, 789 F.3d 847, 853 (8th Cir. 2015) (citing *Travis v. Astrue*, 477 F.3d 1037, 1042 (8th Cir. 2007) (quotation and citation omitted)).  The Eighth Circuit has observed, "[o]ur touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide."  *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003).

In this case, the ALJ did not specifically discredit Ms. Tilley's report of pain or mental limitations, but rather found that despite her symptoms she was not totally disabled within the strict definition of the Act.  (ECF No. 10, p. 172).  Therefore, Plaintiff's argument regarding the ALJ's assessment of her own credibility is inaccurate, as he did not entirely discredit her testimony.

Plaintiff's argument that a credibility determination was not made regarding the testimony of Toni Pullen, the Plaintiff's mother, is contradictory as two sentences later Plaintiff's brief acknowledges that, "[T]he ALJ stated that the mother's testimony supported the Plaintiff's testimony but was not supported by objective evidence."  (ECF 13, p. 13).

Plaintiff argues the ALJ never provided any conflicts or inconsistencies in support of his rejection of credibility.  (ECF No. 13, p. 13).  However, the ALJ considered conflicts between Plaintiff's reports and her statements to her treating physicians, particularly her testimony that her two grandchildren stayed with her, but she did not care for them, while she reported to Dr. Rippy that she was experiencing stress due to having guardianship of her young grandson. (ECF No. 10, pp. 164, 170, 213).  The ALJ considered periods of time when Plaintiff did not receive treatment for her conditions, including when she went three years between appointments with Dr. Gustafson, and a report to Dr. Rippy that she had been out of pain medication for months.  (ECF

No. 10, p. 169; ECF No. 10-1, p. 344).   The ALJ also considered the effectiveness of Plaintiff's medications, noting her reports to River Valley Primary Care and Dr. Efird that her Lamictal prescription was working well.  (ECF No. 10, p. 169).   The ALJ also considered indications in the record that Plaintiff had been overusing narcotic pain medications, noting evidence in the medical record that Plaintiff was assessed with opioid dependence with continuous use, that she requested narcotics multiple times in one visit with Dr. Rippy, and that it was noted her syncope during one ER admission was felt to be due to dehydration and illicit drug use.  (ECF No. 10, p. 170, 172).

The Court finds that the ALJ properly considered the *Polaski* factors and that his credibility determination was supported by substantial evidence.

### E.   RFC Determination

Plaintiff argues that there is no substantial evidence to support the ALJ's determination that Plaintiff was not disabled, as it was not supported by either examining or treating source opinion evidence.  (ECF No. 13, p. 14-15).   Much of this argument has already been addressed above.   She further argues that the postural limitations are problematic as the DDS physician's evaluation of the MER were written more than two years prior to the ALJ's RFC determination, and the files they reviewed did not contain the complete record.   (ECF No. 13, p. 15).

RFC is the most a person can do despite that person's limitations. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).   It is defined as the individual's maximum remaining ability to do sustained work activity in an ordinary work setting "on a regular and continuing basis."   20 C.F.R. §§ 404.1545, 416.945; Social Security Ruling (SSR) 96-8p.   It is assessed using all relevant evidence in the record.   *Id*.   This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of her limitations.  *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005); *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th

Cir. 2004).    Limitations resulting from symptoms such as pain are also factored into the assessment.  20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3).    The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question."    *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001).    Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace.  *Lewis v. Barnhart,* 353 F.3d 642, 646 (8th Cir. 2003).    Nevertheless, in evaluating a claimant's RFC, an ALJ is not limited to considering medical evidence exclusively.  *Cox v. Astrue*, 495 F. 3d 614, 619 (8th Cir. 2007) (citing *Lauer v. Apfel*, 245 F.3d at 704); *Dykes v. Apfel*, 223 F.3d 865, 866 (8th Cir. 2000) (per curiam) ("To the extent [claimant] is arguing that residual functional capacity may be proved only by medical evidence, we disagree.").    Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner.    20 C.F.R. §§ 416.927(e)(2), 416.946.

In this case, the ALJ considered and gave great weight to the opinion of Dr. Efird, and substantial weight was given to the assessments of both non-examining consulting physicians, except that the ALJ added additional seizure precautions.  (ECF No. 10, pp. 169, 172).  The ALJ also considered treatment records from 2007 to April 2016 from a multitude of medical sources regarding both Plaintiff's physical and mental impairments.   (ECF No. 10, pp. 165-172). Those records contained a great deal of information concerning Plaintiff's limitations, including pain.  Treatment records from Dr. Thurman showed physical examinations performed in June, July and September of 2014 were normal in the areas of: gait, strength in arms and legs, negative straight-leg-raise tests, range of motion, and mental status.   (ECF No. 10, p. 227-230, 241-242). Treatment records from Dr. Belinga from September and December of 2015 noted that Plaintiff's

mental status, muscle tone bulk and strength, reflexes, coordination, and gait were normal. (ECF No. 10-1, pp. 389, 394).

Plaintiff argues the ALJ failed to consider opinion evidence in making his mental RFC assessment, as Dr. Efird's report indicated that it was reasonably probable that Plaintiff would have problems with sustained persistence and that her mental pace was mildly to moderately slow. (ECF No. 13, p. 15-16). Dr. Efird examined the effects of identified mental impairments on adaptive functioning and found that Plaintiff: communicated and interacted in a reasonably socially adequate, but anxious manner; communicated most basic information in a reasonably intelligent and effective manner; had the capacity to perform basic cognitive tasks required for basic work like activities; struggled markedly on the tasks of digit span and serial threes; did not have notable problems with persistence during the evaluation, but that sustained persistence over longer time frames was reasonably probable; and, that her mental pace of performance was probably mildly to moderately low. (ECF No. 10-1, p. 341). The ALJ considered and gave great weight to Dr. Efird's opinion, and substantial weight to the opinions of Dr. Simon and Dr. Mourot who interpreted Dr. Efird's opinion and opined that Plaintiff was limited to work involving simple, repetitive, routine tasks. (ECF No. 10, pp. 684-688, 753, 756). The final RFC assessment limited Plaintiff to simple, routine, repetitive tasks in a setting where interpersonal contact was incidental to the work performed, and to work where she could respond to supervision that was simple, direct and concrete. (ECF No. 10, p. 163).

The ALJ's RFC determination is supported by the medical and other evidence of record. The lack of RFC assessments from Plaintiff's treating physicians does not render the ALJ's RFC determination invalid. The ALJ's RFC determination is supported by substantial evidence.

### F.  Vocational Expert Testimony

"The ALJ's hypothetical question to the vocational expert needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole."  *Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011) (citing *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006)).   The ALJ's hypothetical question included all the limitations found to exist by the ALJ and set forth in the ALJ's RFC determination.   Based on our previous conclusion that the ALJ's RFC findings are supported by substantial evidence, we conclude that the hypothetical question was proper, and the VE's answer constituted substantial evidence supporting the Commissioner's denial of benefits.   *Id*., *see also Lacroix*, 465 F.3d at 889.

### IV. Conclusion

For the reasons and upon the authorities discussed above, it is recommended that the ALJ's decision be affirmed and the Plaintiff's Complaint be dismissed with prejudice.

**The parties have fourteen (14) days from receipt of this report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact.   We remind the parties that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 14th day of December 2018.

/s/ *Mark E. Ford*
HONORABLE MARK E. FORD
UNITED STATES MAGISTRATE JUDGE